[No. 24356. Department One. April 21, 1933.]

MATT SEIBERT, *Appellant*, v. D. J. RITCHIE, *Respondent*.[1]

*George F. Hannan,* for appellant.

*Poe, Falknor, Falknor & Emory,* for respondent.

MILLARD, J.—On November 18, 1931, while crossing Weller street at its intersection with Twelfth avenue south, in the city of Seattle, plaintiff, a pedestrian, was struck by an automobile owned and operated by the defendant. Plaintiff instituted this action against defendant to recover fifteen thousand dollars as compensation for personal injuries sustained in that accident. Trial of the cause to a jury resulted in a verdict for six hundred dollars in favor of the plaintiff, whose motion for a new trial on all of the statutory (Rem. Rev. Stat.,

[1]Reported in 21 P. (2d) 272.

28

§ 399) grounds, except newly discovered evidence and accident or surprise, was overruled. From judgment entered on the verdict, the plaintiff has appealed.

Counsel for appellant assigns as error the action of the trial court in sustaining objection to certain cross-examination of respondent's expert witness.

The trial court's ruling was erroneous and prejudicial. The pivotal question in the cause was whether appellant's disability—if he was disabled—was the result of the injury sustained in the accident of November 18, 1931, or whether the disability was the result of an injury sustained by the appellant twelve months or more prior to the accident out of which this action arose.

Respondent's witness, Dr. Anderson, never examined the appellant. He testified on direct examination that, in his opinion, based exclusively on his examination of an X-ray of appellant's shoulder and collar bone taken nineteen days after the accident of November 18, 1931, the injury of which appellant complained occurred at least a year prior to November 18, 1931. His testimony was as follows:

"Q. Will you step down here to the shadow box a moment? I want to call your attention first to Defendant's Exhibit No. 8, an X-ray taken by Dr. Thompson on December 7, 1931. This accident occurred nineteen days before, or on November 18, 1931. I want you, in your own way, to explain to the jury and his Honor what that shows with reference to the left clavicle, the collar bone, and the surrounding bones. A. It shows that there has been an old fracture or break through his left collar bone, and that it has been broken in more than one piece; that is what we call a comminuted fracture; and that it is an old fracture. One fracture line extended through here (indicating); the other ones go out and extend through here (indicating) and that piece, roughly a triangular piece or shape, belongs in that part of the collar bone (indicating). The collar

bone should be about the same size and smoothness all the way down, with just a little roughness in this area (indicating), enough to correspond to this. This fracture has healed, with this excessive white line. In my opinion, the bone fracture has healed. The reason why it is white is because the bone has overlapped and is a little bit thicker; the thicker the bone is the whiter it gets. If there is no bone present, then it gets black, just like this skin out here or like the lung area. The thicker the bone is the whiter it is. There is a little white line (indicating), showing that bone has been fractured and grown together again. It is stronger than it was before, as far as that area goes. Q. How long before the date of this radiograph would you say that fracture had occurred, as far as you can estimate it? A. Well, from the X-ray's appearance, my opinion is it happened at least a year before and that it has happened since he has been ten years of age. Q. Doctor, I wish you would explain further the attachments or ligaments that hold together the collar bone and shoulder blade, where those are located and so on. A. Roughly, the collar bone on this left side extends crosswise of the chest bone in the front, where it is hinged on the outside of the shoulder there (illustrating). Ligaments tie it to the chest bone on the back. Here is your shoulder blade, which is, roughly, the size of my hand. The only thing that holds that shoulder blade up here are two sets of ligaments which run between that area and this outer area; that is called the coracoid. This is called the acromial process. You can readily see this shoulder blade runs triangularly. You see, that arm is attached there, so this one bone (indicating) acts like a sling or trapeze to hold up the arm to the shoulder blade; it holds up the shoulder blade. There are three sets of ligaments; one is in the region of the chest bone, one on this side, and one set in between, the coracoid process. Q. This ligament which runs from the collar bone to the coracoid process, where does that attach to the collar bone with reference to the place where this fragment of bone is? A. One of the ligaments inserts directly into that bony fragment. Q. That would indicate at the time of that old

fracture that what had happened with reference to the ligament? A. Since this was broken in several places and there is a muscle extending from the neck down to this arm that acts like a rubber band—just as soon as you loosen this, it contracts or pulls this shoulder blade, it draws this shoulder blade. This fracture would pull it, and the weight of the arm, through the shoulder blade, was added, and that little fragment has pulled down. Gravity pulling down this way (illustrating) and the muscle pulling that way pulled these two pieces of bone apart. Then the process by which a doctor tries or attempts to reduce it is to force these two together; always try to pull them apart and shove them past each other. Q. You mean these bones here (indicating)? A. This area where the fracture was. Q. What would the tearing of that ligament at the time of this fracture do to this joint? A. I think the best way I could explain that is this: The ligaments act like hinges; you can move them; they are not stiff like bone. If you go to the door there and hang on it and pull one hinge loose, it is apt to spring the other hinge. You could pull one hinge loose by hanging on the door and it is apt to spring the other one a little bit when that is broken enough to pull it down out of place and stretch it. There is a corresponding stretching, then, of the outer ligament of the joint. Q. Does that make a prominence on the outside of the shoulder? A. Yes, whenever these ligaments are stretched the two bones are separated, and then this muscle tends to pull it up and the weight of the arm pulls it down again. Some people are abnormally prominent there any way, and you can feel it between the two sides. Q. I take it from what you say, in your opinion, this separation of the acromial clavicular joint occurred at the time of the old fracture? A. Must have been some injury there at that time.''

Respondent's objection, on the ground that the witness never examined the appellant and based his opinion solely upon an examination of the X-ray, to the following cross-examination of the expert witness, was sustained:

"Q. Now, supposing that prior to the 18th day of November, 1931, this man that you see here, who is the plaintiff, was able to do hard work, to do the work of a wrecker—You have seen the tools here? A. Yes. Q. Suppose that he had an automobile accident on the 18th of November; suppose he hurt his shoulder; and that from that time, right up to the present time, he has not been able to do that work on account of the pain in the shoulder and restricted movement of his arm, would you say that his present condition, under those conditions, is due to an old injury or would you say that it is due to the automobile accident or due to a combination of both?"

■ The purpose of cross-examination of an expert witness is to test the accuracy and reliability of such expert.

"On the cross-examination of any witness, whether an ordinary or an expert witness, counsel are entitled to ask any questions which tend to test the accuracy, veracity or credibility of the witness, or which tend to shake the credit of the witness by injuring his character, although the facts concerning which he is questioned may be, as to the main issue, irrelevant and collateral." Rogers Expert Testimony (2d ed.), § 33.

Suppose the appellant had been examined, prior to the trial, by surgeons who, as respondent's witnesses, testified that their examination disclosed certain conditions just as shown by the X-ray. Suppose those same surgeons testified as to the functioning of the ligaments and the bones and the resultant separation of the bones when certain "ligaments are stretched." That is all, plus Dr. Anderson's explanation, the X-ray showed. Suppose Dr. Anderson had been asked on direct examination to state his opinion, based upon the facts within the scope and range of that testimony, when the fracture occurred. It can hardly be seriously argued that, under such circumstances, the appellant would be restricted to cross-examination of that witness only upon

the facts as produced by the respondent. The rule would be the same whether the opinion of the expert was based on the X-ray or on oral evidence.

"The respondent contends, and the court seems to have held, that it is entirely within the discretion of the court whether, on cross-examination of an expert witness, it will permit hypothetical questions which are not based on the evidence then in the case. The appellant, on the contrary, maintains that, as a matter of right, he was entitled to propound questions which were based on the facts as he contended he would be able to show them to be. . . .

"We think it should at once be conceded that the proper rule is that hypothetical questions propounded on direct examination should be based upon the testimony in the case. But cross-examination should not be so limited. . . .

"We do not think an expert witness is in exactly the same situation as the ordinary witness. He is permitted to give his opinion because he is supposed to be unprejudiced and to be skilled and learned in matters concerning which the average individual is profoundly ignorant. He is not supposed to have any knowledge of the facts of the case. Being ignorant of all the facts, he can testify only from those which are given to him in the hypothetical question. He is permitted to testify for the purpose of throwing light on the question on trial. Such being the situation, the defendant should have been permitted to propound to plaintiff's expert hypothetical questions based upon his theory of what the facts were and not be confined to the facts as shown by his adversary.

"An ordinary illustration will show the point we are trying to develop: Suppose that, in a personal injury case, the chief question involved is whether or not a motorman had used reasonable efforts to stop his street car. The plaintiff produces testimony showing that the grade was level and the track dry and at its best for stopping purposes. He produces an expert and submits to him a question based on the testimony just recited. It is defendant's contention, which in due course he will undertake to prove, that there was a down grade

and that the track was slippery, and the conditions bad for stopping. If, under these circumstances, the defendant may cross-examine only upon plaintiff's recital of the facts, then it is likely there is no use to cross-examine at all. . . .

"The purpose of the cross-examination is not only to try to break down or weaken the testimony favorable to the other party, but also to bring out independent facts and admissions which may be of substantial benefit to the cross-examiner." *Levine v. Barry,* 114 Wash. 623, 195 Pac. 1003.

The court's rebuke of counsel is assigned as error. It is unnecessary to discuss that, since it may not occur in the next trial.

All other assignments of error are without substantial merit.

The judgment is reversed, and the cause remanded with direction to the trial court to grant the motion for a new trial.

HOLCOMB and MITCHELL, JJ., concur.

BEALS, C. J., concurs in the result.